UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE


Mark B. Galvin and Jenny Galvin

      v.                                    Civil No. 12-cv-320-JL
                                          Opinion No. 2013 DNH 053
EMC Mortgage Corporation et al.


**MEMORANDUM ORDER**

In 2005, plaintiff Mark Galvin took out a $2.9 million mortgage loan.  Four years later, he defaulted.  Galvin alleges that although he entered a repayment plan with loan servicer EMC Mortgage Corporation in order to cure this default, EMC began foreclosure proceedings not long after.

Galvin and his wife have now brought a 15-count complaint against EMC and several other entities involved in the servicing and foreclosure of the loan.  The Galvins allege a variety of malfeasance, including failing to properly apply their payments and proceeding with foreclosure despite ongoing negotiations to modify the loan.  This court has diversity jurisdiction over this matter between the Galvins, who are New Hampshire citizens, and defendants, various out-of-state entities, under 28 U.S.C. § 1332 (diversity) because the amount in controversy exceeds $75,000.  The court also has jurisdiction under 28 U.S.C. § 1331 (federal question) and 1367 (supplemental jurisdiction) by dint of the

Galvins' claim under the Truth in Lending Act, 15 U.S.C. § 1601 et seq.

The defendants have moved to dismiss the complaint, arguing that the Galvins have not stated a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).  After hearing oral argument, the court grants the motion as to all but one of the Galvins' claims--that for breach of the implied covenant of good faith and fair dealing in Count 6.  Before explaining the reasons for doing so, however, a brief detour is necessary.

In their opposition memoranda, the Galvins coyly suggest that, should the court dismiss certain counts of their complaint, they will seek leave to amend in order to plead new allegations in support of those counts.[1]  They referred to several of those unpleaded allegations at oral argument, where they also advanced a number of legal arguments and theories of recovery that were similarly absent from both their complaint and memoranda.  This type of conduct betrays a lack of respect for opposing counsel

---

[1]The Galvins are reminded that such contingent statements do "not constitute a motion to amend a complaint." Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 327 (1st Cir. 2008); see also Fisher v. Kadant, Inc., 589 F.3d 505, 509-10 (1st Cir. 2009).  If they wish to amend their complaint, they must either obtain the defendants' written consent or file a motion for leave to do so under Federal Rule of Civil Procedure 15(a)(2).  The court takes no position on whether such a motion would be granted, or whether the amendments to which the Galvins allude state a claim for relief.

and the court, who have expended significant resources attempting to litigate and resolve the present motion, due in no small part to the numerous (and largely meritless, as will be discussed in due course) theories actually included in the Galvins' complaint. The defendants and the court should not be "required to shoot at a moving target," Gierbolini-Rosa v. Banco Popular de Puerto Rico, 121 F.3d 695 (1st Cir. 1997) (table), but that is what the Galvins have invited the court to do by relying upon facts and theories not identified in their complaint or memoranda.  That invitation is declined.  Any facts or theories not pleaded in the complaint, and arguments absent from the Galvins' memoranda, are disregarded in the remainder of this order.  See Order of Feb. 12, 2013 ("No new arguments or claims outside the briefs and pleadings will be entertained."); see also Iverson v. City of Boston, 452 F.3d 94, 103 (1st Cir. 2006) (under "raise-or-waive rule," represented parties must "incorporate all relevant arguments in the papers that directly address a pending motion" or waive them); In re Tyco Int'l, Ltd. Multidistrict Litig., 2004 DNH 047, 3-4 (court cannot take into account facts or allegations found outside complaint when ruling on motion to dismiss).

At oral argument, the Galvins also withdrew over half the counts pleaded in their complaint, disclaiming any intent to pursue Counts 1, 3-5, 7-8, 10, and 12-13.  While the court

appreciates the Galvins' attempt to narrow the issues truly in dispute, it would have been more beneficial (and respectful) to both the court and opposing counsel for the Galvins to make this intent clear in their opposition memoranda, so as to avoid unnecessary expenditures of time and effort.  Because the parties' arguments regarding those counts have been fully briefed and considered by the court, this order examines each of those counts, notwithstanding the Galvins' withdrawal of them.

Turning now to the merits of the action:

- Counts 1 and 15, which are premised upon EMC's alleged breach of the repayment plan agreement, are dismissed because the repayment plan does not contain the promises that the Galvins say were breached.

- Count 2, which advances a variety of theories as to why the defendants lack "standing" to foreclose, is dismissed, as none of these theories states a plausible claim for relief.

- Counts 3-5, which sound in negligence, are dismissed because the allegations set forth in the complaint do not plausibly support the conclusion that the defendants owed the Galvins a duty outside the terms of their contracts.

- Count 6, which seeks to recover for an alleged breach of the implied covenant of good faith and fair dealing, is not dismissed because the Galvins have alleged facts that, if proven, could entitle them to relief on that claim.

- Count 7, which rests on the premise that the Galvins are intended third-party beneficiaries of a contract between EMC and the federal government, is dismissed because that premise is incorrect as a matter of law.

- Counts 8 and 10, which seek to recover from EMC for fraud in the inducement and negligent misrepresentation, are dismissed because the Galvins have not pleaded those claims

with the specificity required by Federal Rule of Civil Procedure 9(b).

- Counts 9 and 11, which are premised upon supposedly false statements made in an assignment of the Galvins' mortgage, are dismissed because the Galvins have identified no such statements on the face of the assignment.

- Counts 12 and 13, both of which are titled "avoidance of mortgage," are dismissed because the theories pleaded in those counts do not entitle the Galvins to relief.

- Finally, Count 14, a claim against EMC for violation of the Truth in Lending Act, is dismissed because it is barred by the applicable statute of limitations.

## I.  **Applicable legal standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In ruling on such a motion, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).  The court "may consider not only the complaint but also "facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).  With the facts so

construed, "questions of law [are] ripe for resolution at the

pleadings stage." Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir.

2009).  The following background summary is consistent with that

approach.

## II.  **Background**

In 2005, Mark Galvin executed a promissory note in the

amount of $2,900,000, payable to Metrocities Mortgage, LLC.  The

note was secured by a mortgage on property in Rye, New Hampshire,

belonging to Galvin and his wife.  Both Galvins executed the

mortgage, which identifies Mortgage Electronic Registration

Systems, Inc. ("MERS"), as the mortgagee in its capacity "as

nominee for [Metrocities and its] successors and assigns."

Mortg. (document no. 10-2) at 2.  The mortgage was subsequently

recorded in the Rockingham County Registry of Deeds.[2]

In 2009, Galvin failed to make the loan payments due for the

months of June, July, and August, leaving him over $40,000 in

---

[2]As the recorded mortgage (Book 4537, Page 1719) is a matter
of public record, this court may take note of it without
converting defendants' Rule 12 motion into a Rule 56 motion for
summary judgment.  See Greene v. Rhode Island, 398 F.3d 45, 48-49
(1st Cir. 2005).  And, as just mentioned, this court may also
consider "facts extractable from documentation annexed to or
incorporated by reference in the complaint."  Rederford, 589 F.3d
at 35.  The mortgage is both attached to and referenced in the
Galvins' complaint.  All other documents cited or quoted in this
order are also either attached to the complaint, referred to
therein, or both.

arrears.  To cure this default, Galvin entered into a written repayment agreement with his loan servicer, EMC.  The agreement, which Galvin executed on September 27, 2009, called for him to make six monthly payments of $9,900, with the last of the payments due in February 2010.  Although the repayment agreement makes no mention whatsoever of modification, refinancing, or foreclosure, the Galvins allege that "Mr. Galvin understood [that] successful satisfaction of his obligations under the [agreement] would result in a permanent loan modification or refinancing, and stop foreclosure proceedings."  Compl. ¶ 36 (emphasis in original).

The Galvins allege that they made all six payments required by the repayment agreement, and that EMC failed to credit their account for those payments.  The Galvins concede, however, that they did not make the regular monthly payments due under their Note during this same time.[3]  On March 1, 2010, EMC sent them an acceleration warning, asserting that Mr. Galvin had "failed to pay the required monthly installments commencing with the payment

---

[3]The complaint is silent as to whether the Galvins made these payments, but their counsel acknowledged at oral argument that they had not.  Because this fact is undisputed, the court takes notice of it for purposes of the present order.  See Stoll v. Principi, 449 F.3d 263, 264 (1st Cir. 2006) (when reviewing motion to dismiss, court may, "for the sake of completeness," supplement facts gleaned from the complaint with "undisputed facts"); McCloskey v. Mueller, 446 F.3d 262, 264 (1st Cir. 2006) (similar).

due" for October 2009, leaving him over $80,000 in arrears. Acceleration Warning (document no. 10-3) at 2.

Upon receiving this notice, Mr. Galvin immediately called EMC, which told him that he could apply for a loan modification through the federal government's Home Affordable Modification Program, or "HAMP." Following EMC's instructions, Mr. Galvin submitted application materials to EMC. Over the next several months, EMC repeatedly told him that it was working to help him avoid foreclosure, and Mr. Galvin believed that "all collection efforts, including foreclosure, would be suspended" while his modification application was pending. Compl. ¶ 44.

Notwithstanding Mr. Galvin's belief, in late April 2010, Harmon Law Offices informed the Galvins that EMC had retained it to foreclose on their mortgage. Over the next several months, the foreclosure and modification processes proceeded on parallel tracks. EMC sent the Galvins a series of letters confirming that it was reviewing their modification application, while Harmon scheduled a foreclosure sale for the middle of June 2010. At around the same time (and presumably in anticipation of the foreclosure), MERS assigned the Galvins' mortgage to The Bank of New York Mellon ("Mellon"), in its capacity as trustee for a

securitized mortgage trust.[4]  Harmon ultimately cancelled that
sale at EMC's direction while EMC continued to review Mr.
Galvin's application materials.  This was not before some damage
had already been done, the Galvins allege, as they had listed
their property for sale but the public notices of foreclosure
sale had impaired their ability to sell to "prospective buyers
[who] were willing to wait to see if they could purchase the
property at a lower price at an auction." Compl. ¶ 85.

    According to the complaint, the application process was also
frustrating for the Galvins.  EMC repeatedly asked the Galvins to
send it information they had already submitted.  It also asked
them to submit information that did not exist:  on one occasion,
it requested a divorce decree (although the Galvins were not
divorced) and on another, requested a profit and loss statement
for Mr. Galvin's self-employment (although Mr. Galvin was not
self-employed).  Although the Galvins believed they had submitted
everything EMC required, in October 2010, EMC notified them that
their application for a HAMP modification was denied for failure
to provide requested documents.  In the same letter, EMC informed
the Galvins that they might be eligible for other programs.  The
Galvins took no further action, and heard nothing from EMC until

---

    [4]On May 20, 2010, the assignment was recorded in the
Rockingham County Registry of Deeds at Book 5112, Page 0754.

March 2011, when it sent a letter informing them that the servicing of their loan would be transferred from EMC to JPMorgan Chase Bank, N.A., which would "use the 'brand name' EMC Mortgage when servicing the loan."  Compl. ¶ 74.

In June 2012, Harmon, acting on Mellon's behalf, sent the Galvins a Notice of Mortgage Foreclosure Sale informing them that it had scheduled a foreclosure sale for August 1, 2012.  That prompted the Galvins to file this action in Rockingham County Superior Court on July 23, 2012, seeking to enjoin the sale.  See N.H. Rev. Stat. Ann. § 479:25, II.  In addition to the facts just related, the Galvins' complaint alleges that beginning in April 2009, EMC "began making unexplained and questionable debits and accountings to the loan."  Compl. ¶ 91.  The defendants removed the action to this court.  See 28 U.S.C. § 1441.

## III. __Analysis__

### A. ___Counts 1 and 15 - Breach of contract and promissory estoppel___

The first and last counts of the Galvins' complaint--for breach of contract and promissory estoppel, respectively--both seek to recover for EMC's alleged breach of the promises it allegedly made in the September 27, 2009 repayment agreement. Specifically, the Galvins claim that EMC violated that agreement by (1) "commencing a foreclosure of the Galvins' home immediately

after the Galvins satisfied their end of the deal" and (2)
"failing to act in good faith to modify the terms of the Note."
Compl. ¶¶ 100-01, 189.  Defendants argue that both counts must be
dismissed because the repayment agreement "does not promise that
EMC will not seek to foreclose following the [repayment] period
and it says nothing about modifying the terms of the Note."
Memo. in Supp. of Mot. to Dismiss (document no. 10-1) at 6-7; see
also id. at 25-26.

The defendants are correct.  When interpreting a written
agreement, the court "give[s] the language used by the parties
its reasonable meaning, considering the circumstances and the
context in which the agreement was negotiated, and reading the
document as a whole."  Birch Broad., Inc. v. Capitol Broad.
Corp., Inc., 161 N.H. 192, 196 (2010).  An agreement will be
given "the meaning intended by the parties when they wrote it,"
but in the absence of any ambiguity, "the parties' intent will be
determined from the plain meaning of the language used in the
contract."  Id.  The court cannot "rewrite the parties' contract
and insert a provision which the parties had never intended to be
a part of the contract," Lowell v. U.S. Sav. Bank of Amer., 132
N.H. 719, 726 (1990); nor does "[p]romissory estoppel . . .
permit circumvention of carefully designed rules of contract law

in the name of equity," Rockwood v. SKF USA Inc., 758 F. Supp. 2d 44, 59 (D.N.H. 2010) (internal quotations omitted).

The plain, unambiguous language of the parties' repayment agreement does not contain any promise by EMC regarding loan modification.  On its face, the agreement addresses only one exceedingly narrow subject:  curing Mr. Galvin's delinquency.  At the very outset, it recites that "[t]his agreement is entered into between [EMC] and [Mr. Galvin] for the delinquent amount due."  Repayment Agreement, Compl. Ex. E at 1 (emphasis added). It notes that Mr. Galvin had failed to make the payments due for June, July, and August of 2009, for a total past due amount of $41,945.79.  It then sets out a schedule whereby Mr. Galvin is to make six payments of $9,900.00 each (for a total of $59,400.00) to cure this delinquency.

There is not the faintest suggestion that if Mr. Galvin makes all six payments, EMC will modify the terms of his Note. Nor does the complaint plead any facts from which one can infer that the parties intended such a term to be a part of the agreement,[5] and as just mentioned, this court has no license to

---

[5]At oral argument, the Galvins suggested that ¶ 36 of their complaint demonstrated such an intent.  That paragraph, however, merely alleges that "Mr. Galvin understood successful satisfaction of his obligations under the [agreement] would result in a permanent loan modification or refinancing."  Compl. ¶ 36.  It does not support the conclusion that both parties to the agreement had such an understanding.

insert provisions to which the parties did not agree into a contract.  Lowell, 132 N.H. at 726.  EMC did not break any promise set forth in the agreement by "failing . . . to modify the terms of the Note."

Nor does the agreement provide that EMC will relinquish its right to foreclose if Mr. Galvin makes all six payments.  The agreement is admittedly ambiguous as to whether, upon repayment, EMC could foreclose as a result of Mr. Galvin's failure to make his June-August 2009 mortgage payments; it is simply silent on this point.  But even if this ambiguity is construed in the Galvins' favor, at best the agreement promises that EMC will not seek to foreclose based upon that particular default.  It does

---

The Galvins also cited ¶ 187 of the complaint at oral argument in support of their promissory estoppel claim.  That paragraph contains a bare assertion, unadorned by any meaningful factual content, that "EMC induced Mr. Galvin to honor his part of the [agreement], namely, make the requirement [sic] payments under the repayment plan by promising Mr. Galvin he either would be given a refinance or modification of his Note, and, most importantly, that no foreclosure proceedings would take place." Compl. ¶ 187.  To the extent this paragraph does not refer to the terms of the agreement itself (which, as just discussed, unambiguously do not contain such a promise), it does not make out a claim for promissory estoppel.  Such a claim arises under New Hampshire law only "when one party has knowingly made representations upon which the other reasonably has relied to his detriment," Appeal of Cloutier Lumber Co., 121 N.H. 420, 422 (1981), and the fulfillment of preexisting contractual obligations "cannot amount to detrimental reliance," Res-Care, Inc. v. Omega Healthcare Investors, Inc., 187 F. Supp. 2d 714, 719 (W.D. Ky. 2001); see also, e.g., Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc., 262 F. Supp. 2d 1334, 1351-52 (S.D. Fla. 1999).

not, by any stretch of reason or language, promise that EMC will forego foreclosing if Mr. Galvin defaults again--as he did when he failed to make his regular monthly mortgage payments beginning in October 2009.  See Mortg. (document no. 10-2) at 4-5, ¶ 1; see also supra n.3 & accompanying text.  EMC did not break any promise set forth in the agreement by commencing foreclosure in response to this second default.

Because the repayment agreement contains neither of the promises upon which the Galvins premise Counts 1 and 15, those counts are dismissed.

### B.   *Count 2 - Lack of standing*

Count 2 of the complaint, captioned "Lack Of Standing," advances a smorgasbord of theories as to why the defendants have no "standing" to foreclose on the Galvins' mortgage.  The Galvins say that defendants cannot foreclose because:

- defendants did not comply with paragraph 22 of the mortgage, which requires the mortgagee to provide the mortgagor with notice of a default and 30 days to cure that default prior to commencing foreclosure;

- the note and mortgage were "bifurcated," thereby rendering the mortgage "void," Compl. ¶ 109;

- in assigning the Galvins' mortgage and/or note, defendants did not comply with the agreement creating the securitized trust that purportedly owns their loan; and

- the individual who signed the assignment of mortgage from MERS to Mellon had a "conflict of interest," id. ¶ 120.

Defendants argue that none of these theories entitles the Galvins to relief.  As discussed below, they are correct.  Count 2 is therefore dismissed.

### 1.   Compliance with the mortgage

Paragraph 22 of the Galvins' mortgage, which is titled "Acceleration; Remedies," requires the mortgagee to "give notice" to the Galvins "prior to acceleration following [their] breach of any covenant or agreement" in the mortgage.  Mortg. (document no. 10-2) at 13.  The provision further requires that the notice inform the Galvins of the actions they must take to cure their breach and of the date by which those actions must be taken.  See id.  And, "[i]f the default is not cured on or before the date specified in the notice," it permits the mortgagee "at its option [to] require immediate payment in full of all sums secured by this Security Instrument without further demand and [to] invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law."  Id. (capitalization in original).

The Galvins claim that defendants did not provide them with the requisite notice prior to commencing foreclosure proceedings in 2012.  At the same time, however, they acknowledge that in March 2010, EMC sent them a notice of intent to foreclose, and do not question that this communication complied in every respect with ¶ 22.  Instead, the Galvins interpret ¶ 22 to require the

mortgagee to give notice before each "attempt to foreclose."
Pls.' Memo. in Supp. of Obj. to Mot. to Dismiss (document no. 13)
at 4.  The March 2010 notice, they say, satisfied ¶ 22's notice
requirement with respect to defendants' June 2010 "attempt to
foreclose," which defendants abandoned while they engaged in
modification negotiations with Mr. Galvin.  But before defendants
could "attempt to foreclose" again in 2012, the Galvins say, ¶ 22
required a new notice.

    The Galvins do not identify any specific language in the
text of ¶ 22 to support this interpretation.  Indeed, their
position is affirmatively at odds with ¶ 22.  By its terms, that
provision requires the mortgagee to give notice only once--
"following Borrower's breach of any covenant or agreement in this
Security Instrument."  Mortg. (document no. 10-2) at 13.  If,
following that breach, the mortgagor fails to cure its default as
specified in the notice, the provision expressly states that the
mortgagee may "at its option . . . require immediate payment in
full of all sums secured by this Security Instrument <u>without
further demand</u>" or pursue other remedies, including foreclosure.
<u>Id.</u> (emphasis added).

    The Galvins do not contend that Mr. Galvin cured his default
at any point after the March 2010 notice.  Defendants were
therefore entitled to commence foreclosure in 2012, even after

having abandoned a prior foreclosure attempt, "without further demand"--i.e., without sending a further notice.  See Wells Fargo Fin. Kan., Inc. v. Temmel, 251 P.3d 112, 2011 WL 1877829, *2-3 (Kan. Ct. App. 2011) (where mortgagee sent notice before initial foreclosure attempt and mortgagor did not cure default, similar mortgage provision did not require mortgagee to resend notice before commencing foreclosure a second time); cf. also New S. Fed. Sav. Bank v. Pugh, No. E2009-02150-COA-R3-CV, 2010 WL 4865606, *5-6 (Tenn. Ct. App. Nov. 29, 2010) (acceleration notice sent pursuant to substantially similar mortgage provision did not become "stale and ineffective" because more than one year elapsed before mortgagee commenced foreclosure).  Plaintiffs have not stated a claim for relief based upon defendants' alleged noncompliance with the notice provision of the mortgage.

### 2.   "Bifurcation" of the note and mortgage

The Galvins also assert, in support of Count 2, that "[a] deep and growing body of case law holds that separation, or 'bifurcation,' of a promissory note from a mortgage renders the mortgage void."  Compl. ¶ 109 (citing Zecevic v. U.S. Bank Nat'l Ass'n, No. 10-E-196, slip op. at 5 (N.H. Super. Ct. Jan. 20, 2011)).  If any such body of case law exists, it is more aptly characterized as shallow and stagnant.  Despite this bold assertion in the Galvins' complaint, their memorandum of law does

not cite a single case supporting their "bifurcation" theory.
Neither the Zecevic case cited in the complaint, nor any other
New Hampshire case of which this court is aware, has endorsed it.
And all of the extrajurisdictional authority this court located
(without plaintiffs' assistance) expressly rejects it.  See,
e.g., Culhane v. Aurora Loan Servs., 708 F.3d 282 (1st Cir. 2013)
("The law contemplates distinctions between the legal interest in
a mortgage and the beneficial interest in the underlying debt.
These are distinct interests, and they may be held by different
parties."); Pehl v. Countrywide Bank, N.A., No. 12-MISC-465911,
2013 WL 324278, *3-4 (Mass. Land Ct. Jan. 29, 2013) ("The
splitting of a mortgage and note . . . does not invalidate or
otherwise void the mortgage."); Greene v. Indymac Bank, FSB, No.
12-cv-347, 2012 WL 5414097, *2 (S.D. Miss. Nov. 6, 2012)
("bifurcation" theory "finds no support in [the] law and has been
repeatedly discredited"); Morgan v. Ocwen Loan Servicing, LLC,
795 F. Supp.2d 1370, 1375 (N.D. Ga. 2011) ("Separation of the
note and security deed . . . does not render either instrument
void.").  In the absence of contrary authority, the court cannot
accord relief to the Galvins on the basis of this theory.

Buried in the Galvins' "bifurcation" theory is the kernel of
a more promising (but still unsuccessful) argument.  In advancing
this theory, the Galvins allege that although Mellon holds the

18

mortgage, it is not in possession of the note, Compl. ¶¶ 26, 111, and argue that possession of the note is necessary for Mellon to foreclose, id. ¶ 104.  A series of recent cases from the New Hampshire Superior Court has lent credence to this argument, holding that a foreclosing entity must acquire ownership of the note before commencing foreclosure proceedings.  See, e.g., Deutsche Bank Nat'l Trust Co. v. Monchgesang, No. 09-C-0200, slip op. at 7-8 (N.H. Super. Ct. March 27, 2012); Newitt v. Wells Fargo Bank, N.A., No. 213-2011-CV-00173, slip op. at 3 (N.H. Super. Ct. July 14, 2011); Zecevic, slip op. at 5-6.  These cases are all based on venerable New Hampshire law "that a mortgage of real estate is a mere incident to the debt for the security of which the mortgage is given; that a transfer of the debt, ipso facto, transfers the mortgage;" and that "[a]n assignment of the mortgage without the debt passes nothing." Whittemore v. Gibbs, 24 N.H. 484 (1852).  Because ownership of the mortgage "follows" ownership of the note in this manner, these recent Superior Court cases have reasoned, a party does not acquire a mortgage--and with it the right to foreclose--until it has acquired the note.

As Judge Delker of the Superior Court recently explained, however, "the intention of the parties to the transaction can override the common law principle that the debt and mortgage are inseparable."  Dow v. Bank of N.Y. Mellon Trust Co., No. 218-

19

2011-CV-1297, slip op. at 14-16 (N.H. Super. Ct. Feb. 7, 2012)

(citing Page v. Pierce, 26 N.H. 317, 324 (1853); Smith v. Moore,

11 N.H. 55, 62 (1840)); see also Page, 26 N.H. at 324 (mortgage

will follow the debt "in the absence of an agreement, express or

implied, to the contrary").  Thus, the court must consider "the

intention of the parties . . . when the original debt and

mortgage were formed" to determine whether a mortgage is

alienable from the associated promissory note.  Dow, slip op. at

15.

Here, the parties plainly intended that the mortgage would

not follow the note.  The Galvins' note and mortgage were held by

different entities from the very beginning:  the note by

Metrocities and the mortgage by MERS as nominee.  In signing the

mortgage, the Galvins acknowledged that MERS was "a separate

corporation" from Metrocities.  Mortg. at 1 (document no. 7 at

39).  They nonetheless agreed, in no uncertain terms, to

"mortgage, grant and convey [the subject property] to MERS . . .

and to the successors and assigns of MERS with mortgage

covenants, and with power of sale."  Mortg. (document no. 7) at

40; see also id. at 41 (agreeing that MERS could "exercise any or

all of [the interests granted by the Galvins], including, but not

limited to, the right to foreclose and sell the property").

Virtually identical circumstances--a disunity of the note and mortgage at the outset of the transaction and an express agreement by the borrower that the named mortgagee or its successors could foreclose--confronted Judge Delker in Dow. Given these circumstances, he concluded that the parties had not intended for the mortgage and concomitant right to foreclose to pass with the note, and held that the foreclosing entity in that case--which had demonstrated that it held the mortgage by assignment (as Mellon does here), but not the note--could proceed with foreclosure.  Dow, slip op. at 17-18; see also Powers v. Aurora Loan Servs., No. 213-2010-CV-00181 (N.H. Super. Ct. Feb. 14, 2011) (similar).  The Galvins have advanced no persuasive argument as to why the same result should not obtain here.[6]  The court therefore concludes that Mellon's alleged lack of possession of the underlying promissory note does not entitle the Galvins to relief.

---

[6]At oral argument, the Galvins directed the court's attention to ¶ 20 of the mortgage, which provides that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower."  Mortg. (document no. 10-2) at 11, ¶ 20. This, they say, shows that the mortgage and note could not be transferred separately (an argument also alluded to in their memoranda).  The Court of Appeals rejected this argument as "jejune" in a footnote in its Culhane opinion, noting that "this language is permissive and by no means prohibits the separation of the two instruments," particularly given the fact that the note and mortgage there were, as here, "separated upon their inception."  708 F.3d at 292 n.6.

### 3.   Compliance with the trust agreement

Although the Galvins contend that Mellon does not hold their note, they also argue that even if the note had been assigned to Mellon, this was done "in violation of the November 1, 2005 SAMI II Trust Agreement," the agreement that created the securitized trust for which Mellon served as trustee.  Compl. ¶ 113.  To the extent such a violation exists, it does not entitle the Galvins to relief.  "As this court has previously explained, a borrower lacks standing to challenge the transfer of a note on grounds that would merely render the transfer voidable (as opposed to void)," and "alleged noncompliance with a [trust agreement] is precisely such a matter."  Calef v. Citibank, N.A., 2013 DNH 023, 11 n. 4 (citing LeDoux v. JP Morgan Chase, N.A., 2012 DNH 194, 13-15; Butler v. Deutsche Bank Trust Co. Americas, No. 12-cv-10337, 2012 WL 3518560, *7 (D. Mass. Aug. 14, 2012)).

### 4.   "Conflict of interest"

The Galvins also allege that the individual who executed the assignment of mortgage from MERS to Mellon, Beth Cottrell, was an employee of JPMorgan Chase and/or EMC.  As noted in Section II, supra, that assignment was made to Mellon in its role as trustee for a securitized mortgage trust.  Because JPMorgan Chase preceded Mellon as trustee of that very same trust, the Galvins assert, "Ms. Cottrell may have worked both on behalf of the

22

assignor (MERS) and assignee ([the trust]).”  Compl. ¶ 119.
This, they say, means that “Ms. Cottrell had a conflict of
interest.”  Id. ¶ 120.  This argument is wholly without merit.

   As an initial matter, where Mellon had already succeeded
JPMorgan Chase as trustee at the time the assignment was made,
one cannot plausibly claim that Ms. Cottrell was acting on behalf
of both MERS and the trust at that time.  It requires no small
amount of logical contortion to weave a “conflict of interest”
from these facts.  Even assuming, however, that some conflict
arose from Ms. Cottrell’s employment by the former trustee of the
trust, that is not an infirmity the Galvins can assert to prevent
defendants from foreclosing.  “New Hampshire law recognizes the
general rule that a debtor cannot interpose defects or objections
[to an assignment] which merely render the assignment voidable at
the election of the assignor or those standing in his shoes.”
Drouin v. Am. Home Mortg. Servicing, Inc., 2012 DNH 089, 7
(quoting Woodstock Soapstone, Co., Inc. v. Carleton, 133 N.H.
809, 817 (1991)).  And it has long been recognized that a
conflict of the nature alleged here--i.e., the signatory’s
employment by both the assignor and assignee--at most makes an
assignment voidable by the assignor.  See, e.g., Irving Bank-
Columbia Trust Co. v. Stoddard, 292 F. 815, 819 (1st Cir. 1923);
cf. also Culhane, 708 F.3d at 294 (rejecting as “little more than

wishful thinking" the argument that signatory's status as agent of both assignor and assignee affected legitimacy of assignment). Plaintiffs have not stated a claim for relief based upon Ms. Cottrell's supposed "conflict of interest."

### C.   *Counts 3-5 - Negligence*

Counts 3-5 of the Galvins' complaint sound in negligence.  They allege that EMC, Mellon, and MERS each owed the Galvins a duty of some kind--EMC "to act with reasonable care in administering the loan," Compl. ¶ 122; Mellon "to act with reasonable care in retaining contractors and agents to administer the loan," id. ¶ 125; and MERS "to act with reasonable care in claiming or asserting rights and powers over the Mortgage," id. ¶ 128--and that they breached those duties.  The defendants, citing this court's decision in Moore v. Mortgage Electronic Registration Systems, Inc., 848 F. Supp. 2d 107 (D.N.H. 2012), argue that the Galvins cannot maintain a negligence claim because the only duties the defendants owed to the Galvins were those defined by the Galvins' contracts.  The court agrees, and these counts are dismissed.

As explained in Moore, "under New Hampshire law, the relationship between a lender and borrower is contractual in nature," which "typically prohibits recovery in tort" under the economic loss doctrine.  Id. at 133 (citing Wyle v. Lees, 162

N.H. 406 (2011); Ahrendt v. Granite Bank, 144 N.H. 308 (1999)).
Although there are cases in which "a contracting party may be
owed an independent duty of care outside the terms of the
contract," id. (quoting Wyle, 162 N.H. at 410), "the burden is on
the borrower, seeking to impose liability, to prove the lender's
voluntary assumption of activities beyond those traditionally
associated with the normal role of a money lender," id. (quoting
Seymour v. N.H. Sav. Bank, 131 N.H. 753, 759 (1989)).

       The Galvins have not met that burden.  Rather, as in Moore,
the alleged duties they invoke concern the administration of the
loan and the assertion of "rights and powers" over the mortgage,
both of which "fall squarely within the normal role of a lender."
Id.  Indeed, the Galvins have not even attempted to explain how
the defendants voluntarily assumed any "activities beyond those
traditionally associated with" that role.

       They instead argue that because the relief they seek is
equitable, the economic loss doctrine cannot apply.  This
argument is premised upon an apparent misunderstanding of the
doctrine.  As described by the New Hampshire Supreme Court, the
doctrine "preclude[s] contracting parties from pursuing tort
recovery for purely economic or commercial losses associated with
the contract relationship."  Wyle, 162 N.H. at 410.  Thus,
applicability of the doctrine turns not on the nature of the

                                25

relief sought, but on the nature of the harm alleged.  If the
plaintiff seeks to premise a tort claim on economic or commercial
loss, the doctrine applies without regard to whether the
plaintiff seeks an award of damages to remedy a past loss or an
injunction to prevent future loss.  See, e.g., Schaefer v.
IndyMac Mortg. Servs., 2012 DNH 185, 6-9 (plaintiff's tort claims
barred by economic loss doctrine although plaintiff sought
injunctive and other equitable relief, "not damages").  Because
the Galvins' negligence claims seek redress for economic harms
arising in the context of a contractual relationship, the
doctrine applies here.

Nor does this case fall within any exception to the
doctrine.  The Galvins suggest that their relationship with the
defendants is a "special relationship" falling within the so-
called "professional negligence" exception described by the New
Hampshire Supreme Court in Plourde Sand & Gravel v. JGI Eastern,
Inc., 154 N.H. 791, 796-99 (2007).  But the New Hampshire Supreme
Court specifically noted in Plourde Sand & Gravel that this
exception is "narrow . . . and properly so," and that it had
previously "declined to extend the special relationship
principle" beyond a few very specific factual scenarios--none of
which involved lenders and borrowers.  Id. at 796-97.  Federal
courts sitting in diversity jurisdiction "have no license to

expand [state] law beyond its present limits," Douglas v. York
Cnty., 433 F.3d 143, 153 (1st Cir. 2005), and this court will not
do so here (particularly where the state court of last resort has
repeatedly declined to do so itself).[7]

Because the defendants owed the Galvins no duty outside the
terms of their contracts, Counts 3-5 are dismissed.

D.   *Count 6 - Breach of the implied covenant of good faith
     and fair dealing*

Count 6 of the Galvins' complaint purports to state a claim
for breach of the implied covenant of good faith and fair dealing

---

[7]Even if the court were inclined to entertain the Galvins'
invitation to expand the reach of the "professional negligence"
exception, it would not do so in this case.  The Galvins have not
ventured to explain how their relationship with the defendants is
more akin to the types of relationships the New Hampshire Supreme
Court has found subject to the exception than to the vast
majority of contractual relationships that are not subject to it.
Simply citing Plourde Sand & Gravel--which is essentially all the
Galvins have done here--is thin gruel upon which to urge this
court to recognize a novel principle of state common law.

As a further aside, to the extent the Galvins argue that
their claims are subject to the "negligent misrepresentation"
exception set forth in Wyle, 162 N.H. at 410-12, the court cannot
agree.  As articulated in that case, that exception applies where
"one party has deliberately made material false representations
of past or present fact, has intentionally failed to disclose a
material past or present fact, or has negligently given false
information with knowledge that the other party would act in
reliance on that information in a business transaction with a
third party."  Id. at 411 (citing United Int'l Holdings, Inc. v.
Wharf (Holdings) Ltd., 210 F.3d 1207, 1226-27 (10th Cir. 2000)).
No such allegation appears in any of the negligence counts or,
for that matter, anywhere else in the complaint.  Cf. also Part
III.F, infra.

against EMC and Mellon.  Because the allegations of the complaint
arguably make out such a breach, this claim is not dismissed.[8]

"In every agreement, there is an implied covenant that the
parties will act in good faith and fairly with one another."
Birch Broad., Inc. v. Capitol Broad. Corp., Inc., 161 N.H. 192,
198 (2010).  This covenant is subdivided "into three general
categories:  (1) contract formation; (2) termination of at-will
employment agreements; and (3) limitation of discretion in
contractual performance."  Id.  The Galvins' claim appears to be
based upon the third category.  "While the third category is
comparatively narrow, its broader function is to prohibit
behavior inconsistent with the parties' agreed-upon common
purpose and justified expectations as well as with common
standards of decency, fairness and reasonableness."  Id.

In support of their claim, the Galvins have alleged that EMC
"disavowed" the September 27, 2009 repayment agreement, "[f]ailed
to Credit the Galvins' account for payments made pursuant to
[that] agreement," and "[r]an the Galvins through months of

---

[8]Although both EMC and Mellon are named as defendants in
this count, the allegations contained within Count 6 are directed
entirely at EMC.  At oral argument, the Galvins asserted that
Mellon, as the purported mortgagee or noteholder, could be held
liable for the conduct of EMC, its servicer and agent.  While
this theory was inelegantly developed in the complaint and in the
Galvins' memoranda, the court--which remains skeptical--will
permit Count 6 to proceed against Mellon for the time being.

meaningless submissions while allowing their account to fall further into default."[9] Compl. ¶ 135.  The complaint alleges precious few facts to support the averment that EMC "disavowed" the repayment agreement, and the court is skeptical whether the final allegation supports a claim for breach of the covenant.  At a minimum, though, accepting as true the Galvins' allegation that EMC did not credit their account for the payments they made under that agreement, that would certainly be "behavior inconsistent with the parties' agreed-upon common purpose and justified expectations" in entering the agreement.

As defendants point out, there may be some tension between this allegation and the Galvins' allegation, in paragraph 40 of their complaint, that "EMC's own records showed the Galvins made $59,400 in payments" under the repayment agreement.  But, viewing those allegations in the light most favorable to the Galvins, it is plausible that EMC recorded its receipt of the Galvins' payments, but did not apply those payments to the unpaid balance of the Galvins' loan.  Because this conduct, if proven, arguably violates the implied covenant of good faith and fair dealing, Count 6 will not be dismissed.

---

[9]The Galvins also suggest that EMC did not "act in good faith and deal fairly with the Galvins under the HAMP agreement [it] made with the Federal Government." Compl. ¶ 136.  As discussed in the following section, the Galvins may not premise their claims upon any alleged violation of that agreement.

### E.   *Count 7 - Breach of contract - third party beneficiary*

Count 7 of the Galvins' complaint purports to state a claim against EMC for breaching its Servicer Participation Agreement ("SPA"), in which EMC contracted with the federal government to participate in HAMP.  The Galvins allege that "the purpose for the [SPA] was to provide debt relief to homeowners like the Galvins," such that they are the intended third-party beneficiaries of the SPA.  Compl. ¶ 141.  Whatever the SPA's purpose, the Galvins are mistaken as to their status as third-party beneficiaries of that agreement.  This claim must, therefore, be dismissed.

No extensive analysis is necessary.  In Moore, supra, this court had occasion to examine the language of two substantially similar SPAs.  Noting that "federal courts in this circuit have applied a presumption that parties who benefit from a government contract are incidental, rather than intended, beneficiaries, and may not enforce the contract absent a clear intent to the contrary," the court found the SPAs lacking any evidence of such an intent.  848 F. Supp. 2d at 128.  In fact, the court noted, certain provisions of the SPAs--§§ 11E and 7--"support[ed] the contrary conclusion."  Id.  The court accordingly concluded that the plaintiff borrowers in that case could not maintain a claim for breach of the SPA--a conclusion that, the court observed, was

in accord with the views of "the overwhelming majority of courts to have considered whether borrowers are the intended third-party beneficiaries of SPAs." Id. at 128-29 & n.14.

The same result obtains here.  EMC's SPA contains the same two sections upon which this court's analysis in Moore rested, and the Galvins have neither explained how those sections are consistent with their claimed third-party beneficiary status nor pointed to any other sections of the SPA that would confer such status.[10]  The Galvins do note that one of the "whereas" clauses of the SPA states that the agreement's "primary purpose" is "the modification of first lien mortgage loan obligations and the provision of loan modification and foreclosure prevention services relating thereto."  As another judge of this court has pointed out, however, the fact that the parties may have entered the SPA "with the intent of aiding home-loan borrowers does not itself demonstrate the parties' intent to secure an enforceable right for non-parties . . . [a] court cannot infer intent to confer third-party beneficiary status on a plaintiff from the mere fact that the contracting parties had the beneficiary in

---

[10]Again, because the SPA is expressly referenced in the complaint and forms part of the basis for the Galvins' claims, the court may consider it in ruling on this motion to dismiss. See supra n.2.  The SPA is also posted for public review at the Treasury Department's website.  See http://tinyurl.com/EMCSPA (last visited Mar. 28, 2012).

mind when creating the contract." Cabacoff v. Wells Fargo Bank, N.A., 2012 DNH 188, 12-13 (Barbadoro, J.).  Count 7 is dismissed.

**F.  *Counts 8 & 10 - Fraud in the inducement and negligent misrepresentation against EMC***

Counts 8 and 10 of the Galvins' complaint, for fraud in the inducement and negligent misrepresentation, respectively, are brought against EMC.  Those counts stem primarily from EMC's alleged "statements that the Galvins would be eligible for a loan modification," Compl. ¶¶ 147, 166, which, the Galvins claim, led them to enter the September 27, 2009 repayment agreement and otherwise harmed them.  To a lesser degree, the counts also rely on allegedly false statements by EMC "that its services were consumer-friendly and capable of providing debt relief to the Galvins." Id. ¶ 168.  Neither count entitles the Galvins to relief.

Both counts suffer from the same deficiency.  Both are subject to Federal Rule 9(b)'s heightened pleading standard.  See N. Amer. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13, 15 (1st Cir. 2009).  That rule, which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), "means that a complaint rooted in fraud must specify the who, what, where, and when of the allegedly

false or fraudulent representations." Moore, 848 F. Supp. 2d at
130.  Nowhere in the complaint, however, do the Galvins identify
who told them, or when and where they were told, that:

- They "would be eligible for a loan modification."  The only
  allegations in the complaint regarding EMC's representations
  about a possible loan modification are that EMC told Mr.
  Galvin that (1) "he could apply for" or "might be eligible
  for" a loan modification, Compl. ¶¶ 42, 64 (emphasis added);
  and (2) he was in the process of being reviewed for a loan
  modification, id. ¶¶ 49, 59-63.  It goes without saying that
  neither of these statements amounts to a representation that
  the loan would be modified, as the Galvins suggest.

- EMC's "services were consumer-friendly and capable of
  providing debt relief to the Galvins."  Again, while the
  complaint alleges that EMC told the Galvins that it "was
  working with" them "to help them avoid foreclosure," id. ¶
  45 (an allegation that is itself unaccompanied by any
  further detail), this hardly qualifies as a statement that
  this process would be "consumer-friendly" or "capable of
  providing debt relief."

The complaint also fails to identify what false or
misleading statements EMC made "concerning the Galvins' payments
and whether the foreclosure had been stopped."  While EMC told
Mr. Galvin that he had failed to make his "required monthly
installments commencing with the payment due" on October 1, 2009,
Acceleration Warning (document no. 10-3) at 2; see also Compl. ¶
39, Mr. Galvin did not, in fact, make those payments.  See supra
n.3 & accompanying text.  Similarly, while the complaint alleges
that EMC told the Galvins that it would stop the foreclosure sale
scheduled for June 2010, Compl. ¶¶ 52, 55, it also alleges that
EMC did, in fact, stop that sale, id. ¶ 58.  A party cannot be

held liable for fraud or negligent misrepresentation for speaking the truth, cf. Akwa Vista, LLC v. NRT, Inc., 160 N.H. 594, 601 (2010) (elements of negligent misrepresentation); Snierson v. Scruton, 145 N.H. 73, 77 (2000) (elements of fraud), and to the extent EMC made any other, false statements regarding the Galvins' payments or stopping foreclosure, those allegations are pleaded nowhere in the complaint.  Counts 8 and 10 are dismissed.

**G.    *Counts 9 & 11 - Fraud and negligent misrepresentation arising from the assignment***

Counts 9 and 11 of the complaint, for fraud and negligent misrepresentation, respectively, are premised upon the theory that "the Assignment of Mortgage [from MERS to Mellon] contained materially false statements." Compl. ¶ 162; see also id. ¶ 171. Both counts fail.  An essential element of these claims is a false statement, see Akwa Vista, 160 N.H. at 601; Snierson, 145 N.H. at 77, yet the Galvins have failed to identify any such statement in the assignment.  They suggest that the assignment misrepresented MERS's "status, power and authority with respect to" the Galvins' mortgage. Id. ¶ 171.  All the assignment says regarding MERS's relationship to the Galvins' mortgage, however, is that MERS is the "holder of a mortgage from Mark B. Galvin and Jenny Galvin," Assignment of Mortg. (document no. 7) at 45--which it was.  Counts 9 and 11 are dismissed.

**H.    *Counts 12-13 - "Avoidance of Mortgage"***

Counts 12 and 13 of the complaint are each titled "avoidance of mortgage."  Precisely what cause of action the Galvins mean to assert is unclear; as this court has observed, "in typical legal usage, 'avoidance' refers to the power of a bankruptcy trustee under the Bankruptcy Code to undo 'some prebankruptcy transfers of the debtor's property and most postbankruptcy transfers of estate property.'" Moore, 848 F. Supp. 2d at 137 n.18 (quoting 1 David G. Epstein et al., Bankruptcy § 6-1, at 498 (1992)).  As this is not a bankruptcy case, this power would appear to have little applicability here.  It may be the case that the Galvins' purpose in bringing these claims is to seek a declaration that the mortgage is void or unenforceable against them.  Whatever their intent––and they have not clarified it in their memoranda–– it is clear that neither count states a plausible claim to relief.

Count 12 rests solely on the proposition that "[b]ifurcating the Mortgage from the Note rendered the Mortgage unenforceable." Compl. ¶ 176.  As already discussed in Part III.B.2 supra, this proposition has no merit.  This count is therefore dismissed.

Count 13 suggests that because Mrs. Galvin signed the mortgage, but did not sign the promissory note, she "never

received consideration in exchange for granting an interest in the Galvin's *[sic]* home to MERS, and whatever interest she purportedly granted in the Mortgage should be avoided and declared void and of no effect." Compl. ¶ 179. This theory is equally meritless. New Hampshire common law permitted a wife "to mortgage her estate to secure the payment of her husband's debts," as Mrs. Galvin did here. Adams v. Adams, 80 N.H. 80, 85 (1921) (quoting Parsons v. McLane, 64 N.H. 478, 479 (1888)). In such cases, it was the extension of credit to the husband that served as consideration for the wife's promise. Cf. New Eng. Merchants Nat'l Bank v. Lost Valley Corp., 119 N.H. 254, 257 (1979) (extension of credit to third parties was sufficient consideration for defendant's agreement to guaranty the loan). Although the New Hampshire General Court divested wives of this capacity in 1876, see Adams, 80 N.H. at 85, it has long since repealed that act, see N.H. Rev. Stat. Ann. § 460:2, thus restoring the common-law rule. See Duquette v. Warden, 154 N.H. 737, 742 (2007) ("The repeal of a statute which abrogates the common law operates to reinstate the common-law rule, unless it appears that the legislature did not intend such reinstatement.").[11] Thus, Mrs. Galvin's failure to sign the

---

[11]The Galvins have identified, and the court has found, no indication that the General Court did not intend its repeal to reinstate the common-law rule.

underlying promissory note does not render the mortgage void.
See In re Winter, Bkrtcy. No. 07-10836, Adv. No. 09-1078, 2010 WL
750368, *2 (Bkrtcy. D.N.H. Feb. 3, 2010).  Count 13 is dismissed.

### I.   *Count 14 - Truth in Lending Act*

Finally, Count 14 of the Galvins' complaint claims that
Mellon violated 15 U.S.C. § 1641(g)(1), a provision of the Truth
in Lending Act ("TILA"), by failing to notify them of its
acquisition of their mortgage within 30 days of MERS's May 5,
2010 assignment of that mortgage to it.[12]  Mellon argues that
this claim is barred by TILA's one-year statute of limitations.
The court agrees.

TILA's limitations provision requires that an action for
damages be brought "within one year from the date of the
occurrence of the violation." 15 U.S.C. § 1640(e).  "Where, as
here, the plaintiff's claim is based upon insufficient or
nonexistent disclosures, the limitations period begins running on
the date the disclosures should have been made." Moore, 848 F.
Supp. 2d at 120-21 (citing Rodrigues v. Members Mortg. Co., Inc.,
323 F. Supp. 2d 202, 210 (D. Mass. 2004)).  Applying this rule,

---

[12]In pertinent part, § 1641(g)(1) requires that, "not later
than 30 days after the date on which a mortgage loan is sold or
otherwise transferred or assigned to a third party, the creditor
that is the new owner or assignee of the debt shall notify the
borrower in writing of such transfer."

the Galvins' TILA claim would have accrued on June 4, 2010--
thirty days after the May 5 assignment.  See Squires v. BAC Home
Loans Servicing, LP, No. 11-cv-413, 2011 WL 5966948, *2 (S.D.
Ala. Nov. 29, 2011).  The Galvins did not file this action,
however, until July 23, 2012--over two years later.

     The Galvins argue that the limitations period should be
equitably tolled because, in light of Mellon's failure to comply
with the statute, they had no way of discovering the assignment
had occurred within the limitations period.  This court will once
again assume, without deciding, that equitable tolling applies to
TILA claims.  See Moore, 848 F. Supp. 2d at 121 (noting that
"[s]ome district courts within this circuit have held that TILA's
statute of limitations may be subject to equitable tolling" but
declining to rule on the issue).  As the court noted in Moore,
"equitable tolling of a federal statute of limitations is
appropriate only when the circumstances that cause a plaintiff to
miss a filing deadline are out of his hands," such as "the
defendant preventing the plaintiff from asserting his rights in
some way, or the plaintiff's inability to discover information
essential to the suit despite reasonable diligence."  Id.
(internal quotations and citations omitted).

     No such circumstances operate to save the Galvins' TILA
claim in this case.  The Galvins themselves allege in their

complaint that the assignment in question was recorded in the
registry of deeds on May 20, 2010.  In other words, from that
date forward, Mellon made no secret of its possession of the
Galvins' mortgage; the assignment was a matter of public record
that the Galvins easily could have discovered had they desired.
Thus, any tolling of the limitations period necessarily ended as
of that date.  Cf. Minneweather v. Wells Fargo Bank, N.A., No.
12-cv-13391, 2012 WL 5844682, *5 (E.D. Mich. Nov. 19, 2012)
(equitable tolling of § 1641(g)(1) claim inappropriate where
there was no evidence that defendant attempted to conceal
transfer).  Because the Galvins did not file their TILA claim
until well over two years later, Count 14 is dismissed as time-
barred.[13]

---

[13]While the time bar provides sufficient cause to dismiss
the Galvins' TILA claim, the court perceives two other potential
problems with their claim.  First, several courts have held that
a plaintiff must allege actual damages in order to state a claim
under § 1641(g)(1).  See, e.g., Ramirez v. Kings Mortg. Servs.,
Inc., No. 12-cv-1109, 2012 WL 5464359, *12 (E.D. Cal. Nov. 8,
2012); but see Brown v. CitiMortgage, Inc., 817 F. Supp. 2d 1328
(S.D. Ala. 2011) (rejecting this view).  The Galvins have not
alleged that they suffered any damages from Mellon's alleged TILA
violation.  Second, and more fundamentally, the statute's plain
language appears to require notification only when ownership of a
debt is transferred, not when ownership of a mortgage or other
security interest in a loan is transferred.  See 15 U.S.C. §
1641(g)(1) (requiring action by "the creditor that is the new
owner or assignee of the debt" (emphasis added)); see also
Connell v. CitiMortgage, Inc., No. 11-cv-443, 2012 WL 5511087, *6
(S.D. Ala. Nov. 13, 2012) ("According to the statute . . . the
'mortgage loan' is the credit transaction itself (i.e., the
Note), not the instrument securing that credit transaction (i.e.,

IV.   **Conclusion**

For the reasons set forth above, the defendants' motion to dismiss[14] is GRANTED in part and DENIED in part.  Counts 1-5 and 7-15 are dismissed.  With the (potentially) meritorious thus separated from the meretricious, count 6 may proceed against EMC Mortgage Corporation and Bank of New York Mellon.  All other defendants will be terminated from the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: April 2, 2013

cc:  Jamie Ranney, Esq.
     Paul J. Alfano, Esq.
     Peter G. Callaghan, Esq.

---

the Mortgage).").  As to this latter point, the Galvins claim in their opposition memorandum that they also were not notified of the transfer of their note (a claim they repeated at oral argument), but no such allegation appears in the complaint.  At present, the court need not take a conclusive position on either of these issues, and simply notes their existence for posterity.

[14]Document no. 10.