UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Mark B. Galvin and Jenny Galvin

     v.                               Civil No. 12-cv-320-JL
                                         Opinion No. 2014 DNH 192

EMC Mortgage Corporation et al.

**BENCH TRIAL DECISION:**
**FINDINGS OF FACT AND RULINGS OF LAW**

Plaintiffs Mark and Jenny Galvin filed this action in Rockingham County Superior Court seeking to enjoin defendant Bank of New York Mellon ("Mellon"), in its capacity as trustee for the holders of shares in a pool of securitized mortgages, from foreclosing a mortgage on their property in Rye, New Hampshire. Mellon and its co-defendants--the servicer of the plaintiffs' mortgage loan, EMC Mortgage Corp.; the original mortgagee, Mortgage Electronic Registration System ("MERS"); and Mellon's alleged predecessor as trustee, JPMorgan Chase Bank, N.A.-- removed the action to this court, see 28 U.S.C. § 1441, which has jurisdiction under 28 U.S.C. § 1332 (diversity).

The plaintiffs' amended complaint, which they filed in this court following removal (and following the court's order granting the defendants' motion to dismiss as to 14 of the 15 claims in the original complaint, see Galvin v. EMC Mortg. Corp., 2013 DNH 053 ("Galvin I")), asserts claims for (1) a declaratory judgment that the defendants may not foreclose; (2) violation of the Real

Estate Settlement Procedures Act, 12 U.S.C. § 2601 et seq., by EMC; and (3) violation of the New Hampshire Consumer Protection Act, or "CPA," N.H. Rev. Stat. Ann. Ch. 358-A, by all defendants. The plaintiffs waived the second of these claims before trial, see Pls.' Pretrial Statement (document no. 56) at 3, leaving only their claims for declaratory judgment and violation of the CPA.

After denying the parties' competing motions for summary judgment on these two remaining claims, see Galvin v. EMC Mortg. Corp., 2014 DNH 139 ("Galvin II"), the court conducted a one-day bench trial. The plaintiffs and defendants each submitted a set of proposed findings and rulings and a trial brief before trial; the parties also jointly submitted a pre-trial statement of agreed facts and a timeline of events. With the assistance of these materials, the court makes the following findings of fact and rulings of law, see Fed. R. Civ. P. 52(a), resulting in judgment for the defendants on both counts.

## Findings of Fact

### I.   *The note and mortgage*

1.   On August 22, 2005, Mark Galvin executed a promissory note in the amount of $2,900,000, payable to Metrocities Mortgage, LLC.

2.   Defendants presented the original promissory note to the court for inspection at the bench trial. Plaintiffs did not

2

question the genuineness of the note, a copy of which was entered into the record as defendants' exhibit A.  The note consists of six numbered pages and a two-page "prepayment note addendum."

3.   The sixth page of the note bears Galvin's signature.  On the reverse of that page is an undated stamp that reads: "Without recourse pay to the order of JPMorgan Chase Bank, as Trustee."  The stamp bears the signature of Sam Kobari, who is identified as an "AVP" of Metrocities.

4.   The eight pages of the note and its addendum bear two hole punches at the top of each page, but are held together by a paperclip.  Also attached to these pages by the paperclip is a single-page document titled "Allonge to Mortgage Note." This document is undated, but was prepared at some point in July 2014, after the stamp indorsing the note to "JPMorgan Chase Bank, as Trustee" was placed on the note.

5.   The page titled "Allonge to Mortgage Note" recites the date and amount of the note, and identifies Galvin as the "mortgagor" and Metrocities as the payee.  The page bears the signature of Cory J. Settoon, who is identified as a "Vice President" and "Authorized Officer" of "JPMorgan Chase Bank, N.A. f/k/a JPMorgan Chase Bank, as Trustee."  It reads:

3

> **Pay to the order of** The Bank of New York Mellon
> formerly known as The Bank of New York as
> successor Trustee to JPMorgan Chase Bank N.A. as
> Trustee for the Certificateholders of Structured
> Asset Mortgage Investments II Trust 2005-AR7
> Mortgage Pass-Through Certificates, Series 2005-
> AR7[1]
>
> **Without Recourse**

6.  Frank Dean, a representative of JPMorgan, testified at trial that Cory Settoon is, indeed, a JPMorgan employee authorized to prepare alonges.  Dean further testified to JPMorgan's belief that Mellon is entitled to enforce the note.

7.  The note is secured by a mortgage on property at 17 Heather Drive in Rye, New Hampshire, which is the primary residence of Mark Galvin and his wife, Jenny.  Both Galvins executed the mortgage, which was later recorded at the Rockingham County Registry of Deeds at Book 4537, Page 1719.

8.  The mortgage names MERS as the mortgagee in its capacity "as nominee for [Metrocities and its] successors and assigns." In the mortgage, the Galvins acknowledge that "MERS is a separate corporation" from Metrocities, and agree to "mortgage, grant and convey" the mortgaged property "to MERS . . . and to the successors and assigns of MERS with mortgage covenants, and with power of sale."

---

[1]The Structured Asset Mortgage Investments II Trust 2005-AR7 is hereinafter referred to as the "SAMI II Trust."

4

9.   On May 5, 2010, Beth Cottrell, Vice President of MERS, executed an assignment of the mortgage from MERS to "The Bank of New York Mellon . . . as successor Trustee to JPMorgan Chase Bank, N.A., as Trustee for the Certificate-holders of [the SAMI II Trust]."  On May 20, 2010, the assignment was recorded at the Rockingham County Registry of Deeds at Book 5112, Page 0754.

## II. *Galvin's default and defendants' foreclosure attempts*

10.  Galvin initially had no difficulty making payments on the note, which were between $13,000 and $14,000 per month.  In August 2008, however, Galvin was unexpectedly terminated from his job.  According to Galvin, he was able to "hold things together" for a while, but in June 2009, he stopped making payments on the note.

11.  When he began to experience difficulty making payments, Galvin contacted EMC, his servicer from nearly the outset of the loan, using the phone number provided on his monthly statements.  EMC ultimately offered Galvin an agreement that he says he understood to be a loan modification (the "Repayment Agreement").  The terms of this agreement were memorialized in a written offer letter from EMC, which Galvin signed on September 27, 2009, and returned to EMC.

5

12. As the court discussed in its order on the motion to dismiss, despite Galvin's claimed understanding of the Repayment Agreement, that document's plain language "does not contain any promise by EMC regarding loan modification," and "addresses only one exceedingly narrow subject: curing Mr. Galvin's delinquency." Galvin I, 2013 DNH 053, 12.

13. The Repayment Agreement recited that, due to Galvin's failure to make the payments for June, July, and August of 2009, the loan was nearly $42,000 in arrears. The agreement called for Galvin to make six monthly payments of $9,900 (for a total of $59,400), with the last payment due in February 2010, to cure this delinquency. Galvin made all six payments as required.

14. While making payments under the Repayment Agreement to cure his delinquency, however, Galvin did not make any of the usual monthly payments due under the note. In March 2010, EMC sent Galvin a letter announcing that it intended to foreclose on the mortgage because he had "failed to pay the required monthly installments" on the note.

15. On April 27, 2010, Harmon Law Offices sent Galvin a letter informing him that EMC had retained it to foreclose on the mortgage. Harmon followed this letter up with another letter on May 18, 2010, informing him that it had scheduled

a foreclosure sale for June 16, 2010.  The May 18 letter claimed that the "mortgage is currently held by The Bank of New York Mellon . . . as successor Trustee to JPMorgan Chase Bank, N.A., as Trustee for the Certificateholders of [the SAMI II Trust]."

16.  After he received these letters, and after a friend sent him a newspaper clipping advertising a foreclosure sale of the mortgaged property at Heather Drive, Galvin contacted EMC. He claims that EMC representatives assured him that the foreclosure sale would not go forward, and asked him to submit additional information.  Consistent with these representations, no foreclosure sale took place in 2010.

17.  Since making the final $9,900 payment due under the Repayment Agreement in February 2010, Galvin has made no further payments on the note.  In the intervening four-and-a-half years, Galvin also has not paid any taxes on the property, instead relying upon EMC to make the payments.

18.  In June 2012, Harmon Law Offices sent Galvin a letter informing him that it had scheduled a foreclosure sale of the property for August 1, 2012.  The letter enclosed a "Mortgagee's Notice of Sale of Real Property," which asserted that the mortgage was held by "The Bank of New York

Mellon . . . as successor-in-interest to JPMorgan Chase
Bank, N.A., as Trustee for [the SAMI II Trust]."

19.  After receiving Harmon's letter, Galvin filed this action.
The foreclosure sale did not proceed as scheduled, and no
foreclosure sale has taken place to date.

20.  As a factual matter, there was nothing unfair, deceptive, or
unreasonable about Mellon initiating foreclosure in either
2010 or 2012.  By the time it began the process of formally
foreclosing (by sending Galvin a notice of foreclosure sale
on May 18, 2010), Mellon had received an assignment of the
mortgage from the original mortgagee.  The Galvins did not
prove that Mellon lacked the ability to enforce the note at
that time, but even assuming that Mellon did not have that
ability, New Hampshire law was (and still is) unsettled on
whether it is necessary to hold the note in addition to the
mortgage in order to foreclose.  Given the unsettled state
of the law, Mellon did not act unfairly, deceptively, or
unreasonably in beginning to foreclose the Galvins' mortgage
following Mr. Galvin's default given that Mellon held the
mortgage itself, which, again, included an explicit
agreement by the Galvins that the original mortgagee's
successors and assigns could foreclose the mortgage.

### III. *Galvin's attempts to sell the property*

21. In mid-2009, at around the same time that he signed the Repayment Agreement with EMC, Galvin began marketing the mortgaged property for sale. Galvin described the property as what "some people might call . . . a trophy home, you know, for people that could afford it," consisting of 9700 square feet of living space––including six en suite bedrooms--with an additional 4500 square feet of partially-finished living space. The Town of Rye had appraised the property for just over $4.7 million at that time. After consulting with several real estate brokers, Galvin listed the property for sale at $7.4 million.

22. Galvin claims that while there were some showings, he received only one offer to purchase the property for about $4.5 million dollars. Although that price would have been sufficient to pay off both of Galvin's mortgages on the property, he rejected the offer.

23. Galvin's current realtor, Lauren Stone (who he called as a trial witness), testified that a property in the Rye area comparable to Galvin's in terms of square footage, location, and quality of construction had recently sold for $3.4 million after having been initially listed for $6.9 million.

24.  Galvin says that he has received no offers on the property
     since it was first advertised for foreclosure in 2010.
     There was no evidence presented that suggested that Galvin's
     inability to sell the property was causally related to the
     advertisement of the property for foreclosure in either 2010
     or 2012.  If anything, the evidence suggests that Galvin's
     inability to sell the property can be attributed to an
     asking price well above both the appraised value of the
     property and the sale price of a comparable property.

**IV.  *Inspections of the property***

25.  In September 2009, shortly after Galvin's June 2009 default,
     EMC began conducting regular inspections of the property.
     Over the course of the next three years, EMC conducted 26
     inspections of the property, on the following dates:

| | |
|---|---|
| September 3, 2009 | October 20, 2011 |
| September 25, 2009 | December 8, 2011 |
| May 5, 2010 | January 20, 2012 |
| June 9, 2010 | February 7, 2012 |
| November 18, 2010 | February 8, 2012 |
| December 28, 2010 | February 25, 2012 |
| February 10, 2011 | February 29, 2012 |
| March 4, 2011 | March 6, 2012 |
| March 28, 2011 | March 31, 2012 |
| April 20, 2011 | May 11, 2012 |
| May 13, 2011 | May 31, 2012 |
| July 12, 2011 | July 13, 2012 |
| August 1, 2011 | July 19, 2012 |

26.  These more or less once-monthly inspections were generally
     reasonable in frequency.  At least some of the five

inspections that occurred in the one-month period between February 7 and March 6, 2012, were likely superfluous, but, as a factual matter, these excessive inspections were not unfair or deceptive.  (In light of the foreclosure sale that had been scheduled for August 1, 2012, it was not at all unreasonable for EMC to conduct two inspections within one week in mid- to late July 2012.)

27. The inspections were also reasonable in scope, as evidenced by Galvin's testimony that he never even saw any of the inspectors who entered onto the property, and was notified that the inspections had occurred only after the fact by means of envelopes placed on the front door of the house.

28. Although Galvin claims that EMC did not notify him of these inspections in advance, that he was "constantly" in contact with EMC, and that he had informed EMC that he was living in the property at the time the inspections occurred, none of these factors render the inspections unreasonable (assuming Galvin's claims are true, a proposition the court is not prepared to accept in light of his credibility deficit, see ¶¶ 30-34, infra).  EMC was not required to blindly accept Galvin's representations that he was living in the property even though he had not paid his mortgage in months, and

unannounced visits were more likely than announced ones to reveal the actual condition of the property.

29. EMC charged $14 to Galvin's account for each inspection of the property, for a total of $364. This fourteen-dollar fee per inspection was not unreasonable.

## V. *Witness credibility*

30. Mark Galvin testified at trial. The court did not find him to be a particularly credible witness. His delivery, demeanor, and tone did not enhance his credibility, in some instances undermined it, and generally created an impression that Galvin was attempting to advocate or advance a position or argument, as opposed to simply reporting recollected facts.

31. The substance of Galvin's testimony was no more convincing than its delivery. Galvin's claim that he believed that the Repayment Agreement was to function as a loan modification, for example, is hard to accept. As already noted, no mention of any loan modification of any kind is made in that document, the terms of which address only one subject: curing Galvin's default. See Galvin I, 2013 DNH 053, 12. While the court is not inclined to hold laypeople to the same standards of contract interpretation it expects of attorneys, Galvin is, by his own account, a sophisticated

businessperson who has started four successful companies and
has helped other people start over ten more.  The court
seriously doubts that, were Galvin the one who had loaned
money rather than borrowed it, he would interpret the
Repayment Agreement in the manner to which he testified.
And, while Galvin suggested in his testimony that EMC had
led him to believe that the agreement was a modification, he
identified no specific statements by anyone at EMC to that
effect, and it is, again, implausible that someone as
business-savvy as Galvin would be so naïve as to rely upon
an oral representation regarding the agreement's contents
that is at odds with the contents of the written instrument
itself.

32. Galvin's claimed interpretation of the Repayment Agreement
    illustrates another problematic aspect of his testimony as
    well:  a tendency to selectively insist upon or disregard
    rigid technicality depending upon the situation before him.
    So, as noted, Galvin insisted that the agreement served as a
    loan modification––an incredibly loose (and in this court's
    view, unsupportable) reading of the document.  Yet when
    asked by defendants' counsel whether the 2010 letter from
    Harmon Law Offices (described in ¶ 15, supra) informed him
    that Bank of New York Mellon was the holder of the mortgage,

Galvin denied that and, in a combative tone of voice, pointed out that the letter identifies "The Bank of New York Mellon formerly known as The Bank of New York as successor Trustee to JPMorgan Chase Bank, N.A., as Trustee for the Certificateholders of [the SAMI II Trust]" as the holder of the mortgage. While that is certainly true, Galvin's insistence on quoting directly from the letter's language while taking a considerably more lax view of the language of the Repayment Agreement demonstrates an inconsistency and selectivity that undermines Galvin's credibility.

33. The substance of the testimony related in the two foregoing paragraphs contributed to the appearance that Galvin was, at a minimum, attempting to shade his testimony to his benefit. Even in the absence of that testimony (and other testimony like it), though, the court would not have found Galvin's testimony to be credible because, as related in ¶ 30, supra, his overall demeanor, delivery, and tone, created an impression of untrustworthiness.

34. In sum, the court did not credit much of Galvin's testimony. Accordingly, where that testimony was not corroborated by some other evidence, the court has, for the most part, disregarded it. Therefore, in the foregoing findings of

fact, the court has omitted certain claims Galvin made during his testimony.

35. Lauren Stone, a real estate agent, also testified for the Galvins. Based upon Stone's demeanor, delivery, and tone, the lack of any apparent motive for her to testify falsely, and the general plausibility of her testimony when assessed in light of the totality of the evidence presented, the court found her to be a generally credible witness.

36. Frank Dean, a home loan research officer for JPMorgan, testified for the defendants. Based upon Dean's demeanor, delivery, and tone, and the general plausibility of his testimony when assessed in light of the totality of the evidence presented, the court found him to be a generally credible witness.

## **Rulings of Law**

### I. *Declaratory judgment*

37. Count 1 of the Galvins' complaint seeks a declaratory judgment under N.H. Rev. Stat. Ann. § 491:22, which permits "[a]ny person claiming a present legal or equitable right or title" to "maintain a petition against any person claiming adversely to such right or title to determine the question as between the parties." The Galvins contend that Mellon is not entitled to lawfully foreclose their mortgage under N.H.

Rev. Stat. Ann. § 479:25.  As will be discussed in short
order, that contention is without merit.

38.  Before addressing Mellon's ability to foreclose under
§ 479:25 at present, however, the court pauses to address an
ancillary theory advanced in Count 1.  In addition to
contending that Mellon may not currently foreclose, the
Galvins argue that Mellon likewise could not foreclose in
either 2010 or 2012, when it noticed foreclosure sales of
the Rye property.  In noticing those sales, the Galvins say,
Mellon "negatively affected" their property's value; they
seek damages for this alleged diminution in value.  Pet'rs'
Trial Memo. (document no. 57) at 3.

39.  The Galvins may not use their § 491:22 declaratory judgment
claim as a vehicle for challenging Mellon's foreclosure
attempts in 2010 and 2012.  As the language of the statute
itself, quoted above, suggests, a claim under § 491:22 is a
means to determine the existence of a legal or equitable
right or title at "present"--i.e., at the time of judgment--
and not a means "to enforce a claim against the defendant"
for past wrongs.  Benson v. N.H. Ins. Guar. Ass'n, 151 N.H.
590, 593 (2004); see generally 5 Gordon J. MacDonald,
Wiebusch on N.H. Civil Practice & Procedure § 36.05 (4th ed.
2014).  So, even assuming that Mellon could not have

lawfully foreclosed when it noticed foreclosure sales in 2010 and 2012, that may not serve as a basis for relief on Count 1.[2]

40. Turning to Mellon's ability to foreclose at present, the court concludes that Mellon is entitled to foreclose the Galvins' mortgage under § 479:25.

41. Section 479:25 permits "the mortgagee or his assignee" to conduct the foreclosure of a power of sale mortgage. As discussed at length in Galvin II, 2014 DNH 139, the Galvins assert that the statutory term "mortgagee" refers to the entity that holds both a mortgage and the promissory note associated with it, while the defendants maintain that a "mortgagee" need hold only the mortgage. In its prior order, this court declined to choose between the parties' competing interpretations, instead electing to give the

---

[2]In any event, the Galvins did not establish that they suffered any damages as a result of those foreclosure attempts. They presented no competent evidence establishing the actual value of the property prior to Mellon's foreclosure attempts, or its value after them. While Mr. Galvin suggested that Mellon's foreclosure attempts had contributed to his inability to sell the property, there was also no competent evidence supporting that theory, as discussed in ¶ 24, supra. And, perhaps even more fundamentally, if the Galvins suffered any damages of any kind as a result of Mellon's foreclosure attempts, those damages were not caused by the fact that Mellon (as opposed to some other entity) was attempting to foreclose, but by the fact of the foreclosure proceedings themselves, which were occasioned by Galvin's default on his payment obligations, and not by any wrongful conduct by Mellon or any other defendant.

parties the opportunity to present evidence as to whether Mellon holds both the note and mortgage.  The court still need not choose between those interpretations, because the evidence at trial established that Mellon does, in fact, hold both the Galvins' note and their mortgage.

42.  By virtue of the May 5, 2010 assignment from MERS, Mellon holds the mortgage.  Although the Galvins had previously challenged the validity and effect of this assignment-- challenges the court rejected in Galvin I, 2013 DNH 053, 22- 24, and Galvin II, 2014 DNH 139, 10-17--they did not renew those challenges (or raise any new ones) in their written or oral presentations to the court at trial.

43.  Mellon also holds the note, and has the right to enforce it.

44.  As the court has previously discussed:

> [A] promissory note is a negotiable instrument subject to the provisions of Article 3 of the Uniform Commercial Code ("UCC").  Under the UCC, the holder of an instrument may enforce it.  N.H. Rev. Stat. Ann. § 382-A:3-301.  A holder is a person who is in possession of an instrument drawn, issued, or indorsed to him or to his order. At the outset of the loan, then, Metrocities was the holder of the note.

Galvin II, 2014 DNH 139, 18 (alterations and case citations omitted).

45.  When Metrocities indorsed the note to "JPMorgan Chase Bank, as Trustee" on the back of page six of the note, JPMorgan

became the holder of the note, with the concomitant power to
enforce it.  Id.

46.  When JPMorgan later indorsed the note to Mellon, using an
     allonge attached to the note by means of a paperclip, Mellon
     then became the holder of the note.

47.  The Galvins have challenged both indorsements of the note,
     raising two separate issues:  first, that the stamped
     indorsement on the back of page six of the note does not
     identify the trust for which JPMorgan was acting as trustee
     when the note was assigned to it; and second, that the later
     indorsement to Mellon by allonge is affixed to the note only
     by means of a paperclip, which the Galvins maintain is not a
     "permanent affixation" of the allonge to the note, which
     they say is required under the UCC.  Neither challenge is
     persuasive.

48.  The fact that the indorsement on the back of page six does
     not identify the trust for which JPMorgan was acting as
     trustee has no significance.  As this court previously
     ruled, "when a note is indorsed to a party in its capacity
     'as Trustee,' but the indorsement does not specify a
     particular trust, that merely raises a factual question as
     to the identity of the entity to which the note was
     indorsed, rather than calling into question the authenticity

of the note or indorsement." Id. at 21-22.  Depending on

the answer, that factual question could have been

dispositive in this case:  if Mellon succeeded JPMorgan as

trustee for that selfsame trust, then N.H. Rev. Stat. Ann.

§ 382-A:3-110(c)(2)(I)--which provides that an instrument

payable to "a person described as trustee or representative

of a trust or estate" is "payable to the trustee, the

representative, or a successor of either"--would entitle

Mellon, by virtue of its role as successor trustee, to

enforce the note without a further indorsement from

JPMorgan.  See id.  Because, however, JPMorgan, acting in

its capacity as trustee, has specially indorsed the note to

Mellon, it is not necessary for the court to identify the

trust on behalf of which JPMorgan took the note and to

determine whether Mellon is JPMorgan's successor as trustee.

In other words, even if Mellon is not JPMorgan's successor,

it now holds the note, which has been indorsed to it.[3]

---

[3]In an effort to demonstrate that Mellon succeeded JPMorgan as trustee, the defendants offered several exhibits.  Among these were defendants' exhibit J, an "Agreement of Resignation and Assumption" between JPMorgan and The Bank of New York Company, and exhibit K, an "Assignment and Assumption Agreement" between the same two entities.  Both, the defendants claimed, demonstrated that Mellon--formerly known as The Bank of New York--had succeeded JPMorgan as trustee of the SAMI II Trust.

The court has not relied upon these documents.  As related in the plaintiffs' motion in limine (document no. 72), exhibit J was not produced to the plaintiffs until the eve of trial, and

49. With respect to the Galvins' second challenge--to JPMorgan's indorsement of the note to Mellon--New Hampshire's version of the UCC does not require "permanent" affixation of an allonge to a note. An earlier version of the UCC did require an allonge to be "so firmly affixed" to a negotiable instrument "as to become a part thereof." N.H. Rev. Stat. Ann. § 382-A:3-202(2) (1993). Under that version of the UCC, by which some states still abide, some courts took the view that attaching an allonge to a note with a paper clip was not sufficient affixation. See, e.g., HSBC Bank USA N.A. v. Roumiantseva, 975 N.Y.S.2d 709 (N.Y. Sup. Ct. 2013) (holding that allonge clipped to note by a paper clip "was not firmly affixed to the note so as to become a part of the note"); Lamson v. Commercial Credit Corp., 187 Colo. 382, 531 P.2d 966, 968 (1975) (remarking that "a separate paper pinned or paper-clipped to an instrument is not sufficient for negotiation" under earlier version of UCC).

---

the defendants have provided no convincing justification for their lateness. The plaintiffs' motion is granted as to that document, which is excluded from evidence pursuant to Federal Rule of Civil Procedure 37(c)(1). Exhibit K, for its part, makes no reference to the SAMI II Trust--it simply refers to assets and liabilities described in other documents that were not provided to the court--so the court is unable to ascertain its relevance, if any, to the issues in dispute in this case.

50.  Over 20 years ago, however, New Hampshire adopted a revised
     version of the UCC providing that an allonge need only be
     "affixed to the instrument" to be considered "part of the
     instrument." N.H. Rev. Stat. Ann. § 382-A:3-204(a).
     Although the court has found no case law discussing whether,
     under this version of the UCC, an allonge may be "affixed"
     to a note by means of a paper clip, many commentators have
     taken the view that the omission of the adverb "firmly" from
     the revised version allows just that.  One respected
     treatise remarks, for example:

>    [The revised] section merely requires that the
>    paper be "affixed" to the instrument.  Any manner
>    of attaching the paper to the instrument would
>    seem to be sufficient.  There is no requirement
>    that the paper containing the indorsement be
>    firmly attached to the instrument.  Stapling the
>    paper to the instrument is clearly sufficient.
>    Even paper clipping the allonge to the instrument
>    should be sufficient.

6B Lary Lawrence, Anderson on the Uniform Commercial Code §
3-204:12R, at 240 (3d ed. 2003); see also 6 William D.
Hawkland et al., Hawkland's Uniform Commercial Code Series §
3-204:3 (2012) ("Section 3-204(a) omitted old Article 3's
requirement that the allonge be firmly affixed.  Thus, a
paper clipped or stapled to an instrument is sufficient as
an allonge.").

51.  The court agrees with these authorities that attachment of
     an allonge to an instrument by means of a paper clip is
     sufficient to satisfy an § 382-A:3-204(a)'s requirement that
     the allonge be "affixed to the instrument."  Cf. Federal
     Home Loan Mortg. Corp. v. Madison, No. 09-cv-1508, 2011 WL
     2690617, at *4 (D. Ariz. July 12, 2011) (holding that an
     "allonge is sufficiently affixed to the promissory note when
     secured by an Acco fastener").  Accordingly, the allonge
     indorsing the note from JPMorgan to Mellon complied with the
     UCC.[4]

---

[4]The Galvins' pretrial motion in limine, see note 3, supra,
also sought to exclude the allonge, which the defendants produced
to the Galvins only 11 days before trial, from evidence.  As
grounds for excluding the allonge, the motion argues that the
defendants' failure to produce the allonge earlier violated
Federal Rule of Civil Procedure 26(e)(1)'s requirement that
parties supplement their discovery responses "in a timely
manner."  As the Galvins acknowledge, however, the allonge was
only created and affixed to the note shortly before it was
produced to them.  The defendants' production of the allonge to
the Galvins was therefore "timely"; the allonge could not have
been produced earlier because it did not exist earlier.

    The Galvins also decry the execution of the allonge at such
a late juncture as "trial by ambush."  Yet they have not cited,
and the court is unaware of, any authority for the proposition
that a party has an affirmative obligation to execute documents
reflecting that it has transferred its property interest to
another--as JPMorgan did in executing the allonge--at a time that
would be most convenient for its litigation opponents.

    The court understands the Galvins' frustration at having
litigated this entire case without the benefit of the allonge.
In pursuing a theory of relief dependent upon Mellon not holding
the note, though, the Galvins always ran the risk that even if
                                              (continued...)

52. Even assuming, moreover, that the allonge indorsing the note
    to Mellon does not comply with the UCC, Mellon is still
    entitled to enforce the note.  Under N.H. Rev. Stat. Ann.
    § 382-A:3-203(a) & (b), transfer of a negotiable
    instrument--i.e., delivery of the instrument "by a person
    other than its issuer for the purpose of giving to the
    person receiving the delivery the right to enforce the
    instrument"--"vests in the transferee any right of the
    transferor to enforce the instrument, including any right as
    a holder in due course."  This is so "whether or not the
    transfer is a negotiation."  Id.  So when JPMorgan
    relinquished the note to Mellon--with, as JPMorgan
    representative Frank Dean testified, the belief and

---

    [4](...continued)
Mellon did not, in fact, hold the note at the outset of this
case, it would acquire the note at some time prior to judgment,
effectively pulling the rug out from under their declaratory
judgment claim.  Were the court to ignore the allonge at this
point, it would be willfully blinding itself to a fact of
critical importance to that claim.  Such willful blindness might
result in a victory for the Galvins (at least on that claim), but
it would be a hollow victory, because the judgment in their favor
would be premised on a set of facts without any basis in reality.
A judgment that ignores the allonge and declares that Mellon
cannot foreclose because it does not hold the note is a judgment
that is void ab initio.

    So, insofar as the motion in limine seeks to exclude the
allonge, it is denied.  Insofar as the motion seeks to exclude
the "Docline" report produced by JPMorgan on the eve of trial, it
is denied as moot, as the court did not rely on that document in
making these findings and rulings.

expectation that Mellon would be entitled to enforce the
note--that delivery gave Mellon the right to enforce the
note, even if the note was not negotiated by special
indorsement to Mellon.  As the Permanent Editorial Board for
the Uniform Commercial Code has explained:

> [A]ssume that the payee of a note sells it to an
> assignee, intending to transfer all of the payee's
> rights to the note, but delivers the note to the
> assignee without indorsing it.  The assignee will
> not qualify as a holder (because the note is still
> payable to the payee) but, because the transaction
> between the payee and the assignee qualifies as a
> transfer, the assignee now has all of the payee's
> rights to enforce the note and thereby qualifies
> as the person entitled to enforce it.  Thus, the
> failure to obtain the indorsement of the payee
> does not prevent a person in possession of the
> note from being the person entitled to enforce
> it[.]

Report of the Permanent Editorial Board for the Uniform
Commercial Code: Application of the Uniform Commercial Code
to Selected Issues Relating to Mortgage Notes, at 6 (Nov.
14, 2011), available at http://tinyurl.com/PEBReport (last
visited Aug. 29, 2014); see also, e.g., Unicredit Bank AG v.
Jue-Thompson, No. 12-cv-2468, 2013 WL 6185750, *4 (D. Kan.
Nov. 26, 2013) (sale and delivery of note entitled
transferee to enforce instrument "without consideration of
any allonge").  That is essentially the situation here.

53.  Mellon, which holds both the mortgage and note, qualifies as
     a "mortgagee" under either side's definition of the term.

It may therefore foreclose the Galvins' mortgage pursuant to N.H. Rev. Stat. Ann. § 479:25.  Judgment shall be entered in favor of the defendants on Count 1.

## II. *Consumer Protection Act*

54.   In Count 2 of their complaint, the Galvins advance a claim under the CPA, N.H. Rev. Stat. Ann. § 358-A.  The Galvins aver that the defendants committed actionable violations of the CPA through two different courses of action:  first, by Mellon advertising their property for sale at foreclosure in 2010 and 2012 when it was not the "mortgagee," as that term is employed in N.H. Rev. Stat. Ann. § 479:25; and second, by EMC conducting 26 inspections of their property over a roughly three-year period from 2009 through 2012.  None of these actions violated the CPA.

55.   The CPA prohibits the use of "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce" within New Hampshire.[5] N.H. Rev. Stat. Ann. § 358-A:2.  "While the statute provides a list of specific acts that violate this command, the list is not exhaustive and conduct 'of the same type as that

---

[5]The court assumes here, without deciding the issue, that Mellon's 2010 and 2012 foreclosure attempts and EMC's inspections of the Galvin's property did occur in "the conduct of . . . trade or commerce."

proscribed in the enumerated categories' may also qualify as unfair or deceptive." Fin Brand Positioning, LLC v. Take 2 Dough Prods., Inc., 2011 DNH 200, 24 (quoting New Hampshire v. Sideris, 157 N.H. 258, 262 (2008)).  In their complaint, proposed rulings of law, and other pretrial filings, the Galvins have not identified an enumerated provision of § 358-A:2 that they claim the defendants violated, so the court presumes that their claim is made under § 358-A:2's "catch-all" provision.  For non-enumerated conduct to violate the CPA, "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." ACAS Acquisitions (Precitech) Inc. v. Hobert, 155 N.H. 381, 402 (2007).

56. "Whether a party has committed an unfair or deceptive act, within the meaning of the [CPA], is a question of fact." CRMC Bethlehem, LLC v. N. Country Environ. Servs., Inc., No. 09-cv-344, 2010 WL 3002025, *3 (D.N.H. July 29, 2010) (quoting Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993)) (emphasis in original).  As discussed at ¶¶ 20 and 26-29, supra, the acts of which the Galvins complain were not unfair or deceptive.  For the sake of completeness, the court will explain those findings in more detail here.

57.  The Galvins' claim that Mellon violated the CPA by
     initiating foreclosure proceedings in both 2010 and 2012
     comes up short.  That claim rests primarily on the theory
     that when Mellon initiated those proceedings, it was not the
     "mortgagee," as that term is employed in N.H. Rev. Stat.
     Ann. § 479:25, because it was not in possession of the note
     associated with their mortgage at that time.  As such, the
     Galvins contend, those attempts to foreclose were unlawful.
     There are several flaws in this theory.  The most obvious is
     the lack of any factual support for it:  the Galvins did not
     prove that Mellon was not in possession of the note when it
     attempted to foreclose their mortgage in 2010 and 2012.

58.  Setting that infirmity aside entirely, the Galvins' claim
     nonetheless fails.  Even if one accepts the premises that
     (1) a party is not a "mortgagee," and thus cannot foreclose
     under § 479:25, unless it holds the note; and (2) Mellon did
     not possess the note during its foreclosure attempts, Mellon
     did not act unfairly or deceptively in starting to foreclose
     the Galvins' mortgage in 2010 and 2012.

59.  As detailed at great length in Galvin II, 2014 DNH 139, 24-
     32, New Hampshire law was, and is still, unsettled as to
     whether the term "mortgagee" in § 479:25 requires possession
     of the note, and one entirely plausible construction of that

term would require possession of the mortgage only.  At the
time it instituted foreclosure proceedings in both 2010 and
2012, Mellon was the holder of the Galvins' mortgage, by
virtue of the May 5, 2010 assignment from MERS.[6]

60.  Given that the statute plausibly can be construed to permit
a party holding the mortgage only to commence foreclosure--
and particularly in light of the Galvins' express agreement,
in the mortgage itself, that MERS' successors and assigns
could foreclose the mortgage by power of sale--there was
nothing remotely unfair or deceptive about Mellon attempting
to foreclose the mortgage after Galvin had defaulted, even
if it did not also hold the note.  To hold otherwise would
elevate every business decision taken on the basis of a

_____

[6]In their requested rulings of law, the Galvins assert that
Mellon did not hold the mortgage "at the time of the May 18, 2010
foreclosure notice because NH law requires all assignments of
mortgage to be recorded to be effective."  Pet'rs' Am. Requests
for Findings of Fact & Rulings of Law (document no. 69) at 7
(citing N.H. Rev. Stat. Ann. § 477:3-a).  It is unclear whether
the Galvins intend to pursue this theory, which is not presented
anywhere else in their filings.  Assuming that they do, they are
incorrect.  Section 477:3-a does not render assignments and other
transfers of interests in real property ineffective until they
are recorded; it provides only that they "shall not be effective
as against bona fide purchasers for value" until recorded
(emphasis added).  This provision, which codifies the so-called
"race-notice" rule of priority, see, e.g., Bilden Props., LLC v.
Birin, 165 N.H. 253, 257-58 (2013), does not apply here, as
Mellon was not attempting to assert its rights in the mortgage
against a subsequent purchaser who acquired an interest in the
property without notice of Mellon's prior interest.

plausible, but ultimately mistaken, reading of a statute's language to a violation of the CPA.

61.  The Galvins' claim that EMC's property inspections violated the CPA also fails.  That claim is premised on the theory that the inspections EMC conducted from September 2009-July 2012, following Galvin's default, were "unauthorized, unreasonable, and excessive."  Pet'rs' Trial Memo. (document no. 57) at 7.

62.  The inspections were, however, authorized, as were the resultant charges to the Galvins' account:  paragraph 7 of the mortgage itself permits "reasonable entries upon and inspections of the Property," and paragraph 14 allows for the borrower to be charged "for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees."  And, as discussed at ¶¶ 26-29, supra, those inspections were also generally reasonable in frequency, scope, and cost to the Galvins.

63.  The five inspections that occurred in the one-month period between February 7 and March 6, 2012, were likely excessive.  That, however, does not entitle the Galvins to relief under

the CPA.  By conducting excessive inspections of the
property in that month, EMC may have breached paragraph 7 of
the mortgage, which, as noted, permits only "reasonable"
inspections of the property, or it may have breached the
implied covenant of good faith and fair dealing inherent in
the mortgage.  Cf. Moore v. Mortg. Elec. Reg. Sys., Inc.,
848 F. Supp. 2d 107, 129 (D.N.H. 2012) (covenant of good
faith and fair dealing prohibits unreasonable exercise of
discretion conferred on a party by the terms of an
agreement).  The Galvins have not made claims for breach of
contract or for breach of the implied covenant, however;
they have made a claim under the CPA.  And neither "[a]n
ordinary breach of contract claim," Sideris, 157 N.H. at
262, nor a claim for breach of the implied covenant, see PH
Grp. Ltd. v. Birch, 985 F.2d 649, 652-53 (1st Cir. 1993)
(applying Massachusetts analog to CPA), without more,
violates the CPA.

64.  While there might well be circumstances in which a breach of
contract or of the implied covenant rises to the level of a
CPA violation, EMC's conduct here does not fit the bill:  it
is simply not of a kind with the categories of unfair acts
enumerated in § 358-A:2, and, in the court's view, would not
"raise an eyebrow of someone inured to the rough and tumble

of the world of commerce." ACAS Acquisitions, 155 N.H. at 402.  It is not "within the penumbra of some common-law statutory or other established concept of unfairness"; it cannot be characterized as "immoral, unethical, oppressive, or unscrupulous"; and it did not cause "substantial injury." Milford Lumber Co., Inc. v. RCB Realty, Inc., 147 N.H. 15, 19 (2001) (quoting FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5 (1972)).

65. The Galvins have failed to establish that any of the defendants committed an unfair or deceptive act or practice prohibited by N.H. Rev. Stat. Ann. § 358-A.  Judgment shall be entered in favor of the defendants on Count 3.

### Conclusion

Based on the foregoing, the court finds in favor of the defendants on all counts.  The plaintiffs' motion in limine (document no. 72) is GRANTED IN PART and DENIED IN PART as outlined herein.  The clerk shall enter judgment accordingly and close the case.

Pursuant to 28 U.S.C. § 1920, Federal Rule of Civil Procedure 54(d)(1), and Local Rule 54.1(a), the defendants, as the prevailing parties, are entitled to costs other than attorney's fees.  Should the defendants desire an award of such

costs, they shall file a bill of costs as set forth in the Local Rule.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: October 3, 2014

cc:  Jamie Ranney, Esq.
     Timothy Laurent Chevalier, Esq.
     Peter G. Callaghan, Esq.